AUSA:   Jonathan Goulding                    Telephone:  (313) 226-9742

AO 91 (Rev. 11/11)  Criminal Complaint          Special Agent:     Bryan Drake          Telephone:  (313) 965-5884

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Michigan

| | |
|---|---|
| United States of America<br><br>v.<br><br>Firoza Van Horn<br>Muhammad Awaisi | Case No. 20-mj-30473 |

### AMENDED

### CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ June 24, 2020 _____ in the county of _____ Wayne _____ in the
_____ Eastern _____ District of _____ Michigan _____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 371 | Conspiracy to Defraud the United States |
| 18 U.S.c. § 1546 | Visa Fraud |
| 18 U.S.C. § 1015 | False Statements in a Naturalization Proceeding |
| 21 U.S.C. §§ 841, 846 | Unlawful Distribution of a Controlled Substance/Conspiracy |

This criminal complaint is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

_____
Complainant's signature

Bryan Drake, Special Agent
Printed name and title

Sworn to before me and signed in my presence
and/or by reliable electronic means.

Date: _____ 11/17/2020 _____

_____
Judge's signature

City and state: Detroit, MI _____

Curtis Ivy, Jr., United States Magistrate Judge
Printed name and title

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

      Plaintiff,

v.

Firoza Van Horn,
Muhammad S. Awaisi,

      Defendants.

Case No. _____

1

## AMENDED AFFIDAVIT IN SUPPORT OF COMPLAINT

I, Bryan Drake, Special Agent with the Federal Bureau of Investigation, being first duly sworn, hereby deposes and states as follows:

## SUMMARY

This affidavit documents probable cause of a conspiracy to defraud the United States of immigration benefits, and related crimes. The conspiracy is by and between medical professionals, applicants for naturalization, and others. The manner and means of the conspiracy include having medical professionals falsely diagnose disabilities and impairments for naturalization

applicants. The purpose of the false diagnoses is to support requests for a waiver or exception to the statutory requirement that the naturalization applicant demonstrate an understanding of the English language and knowledge of the history and principles of the government of the United States. A fraudulently obtained exception allows an applicant to obtain United States citizenship contrary to law.

This affidavit is being submitted in support of a complaint charging two medical professionals, Firoza Van Horn and Muhammad S. Awaisi, for their role in the conspiracy, and related crimes.

## INTRODUCTION AND AGENT BACKGROUND

1.   I am a Special Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to law and acting as such, and have been employed as such since January 2008, and currently assigned to the FBI Detroit Division charged with investigating health care fraud and prescription drug diversion.  As a Special Agent in the FBI, I have received general law enforcement training at the FBI Academy, as well as specialized training on the subjects of health care fraud, money laundering and telephone analysis from the FBI, and I have been personally involved in investigations concerning health care fraud, national security, prescription drug diversion and methods used to finance and conceal the profits of those operations to investigate health care fraud violations, including schemes to defraud the Medicare and Medicaid programs. During my tenure with the FBI, I have participated in a variety of criminal health care fraud investigations and national security investigations where I have interviewed subjects, witnesses, medical doctors and owners and employees of medical clinics.  I have investigated and conducted surveillance on numerous doctors, pharmacies and prescription drug dealers.  I have consulted with agents and officers of numerous federal, state, and local agencies in gaining an understanding of current trends in the diversion of prescription drugs and health care fraud.

2.   As a Special Agent with the FBI, I am responsible for investigating violations of United States federal law, including, but not limited to Title 18, United States Code, Section 1347 (Health Care Fraud), Title 18, United States Code, Section 1349

(Conspiracy to Commit Health Care Fraud), Title 42, United States Code, Section 1320a-7b(b) (Paying and Receiving Remunerations), Title 21 U.S.C. § 841(a)(1) (Unlawful Distribution of a Controlled Substance) and Title 18, United States Code, Section 1035 (False Statements In A Health Care Matter).  In connection with investigating these offenses, I have participated in the execution of search warrants for documents and other evidence in cases involving violations of these offenses.

3.   I have personally participated in this investigation and am familiar with the relevant facts and circumstances. The facts and information contained in this Affidavit are based upon my knowledge and observations, information derived from records obtained in the course of this investigation, information from other experienced FBI agents, the United States Citizenship and Immigration Services ("USCIS") and the United States Customs and Border Protection ("CBP"), along with information gained from my training and experience. I have not set forth each and every fact learned during the course of this investigation, but simply those facts that I believe are necessary to establish probable cause to support a criminal complaint.

4.   Based on my training and experience, and the information set forth below, there is probable cause to believe that the following offenses have been committed by Firoza Van Horn and Muhammad S. Awaisi: 18 U.S.C. § 371 (Conspiracy to Defraud the United States), 18 U.S.C § 1546 (Fraud and Misuse of Documents), 18 U.S.C. § 1051(a) (False Statements in a Naturalization Proceeding), and 21 U.S.C. §846 (Conspiracy to Distribute).

## VIOLATION STATUTES

5.    18 U.S.C. § 371 (Conspiracy to Defraud the United States). If two or more persons

conspire either to commit any offense against the United States, or to defraud the

United States, or any agency thereof in any manner or for any purpose, and one or

more of such persons do any act to effect the object of the conspiracy, each shall be

fined under this title or imprisoned not more than five years, or both.

6.    18 U.S.C § 1546(a) (Fraud and Misuse of Documents). Whoever knowingly makes

under oath, or as permitted under penalty of perjury under section 1746 of title 28,

United States Code, knowingly subscribes as true, any false statement with respect

to a material fact in any application, affidavit, or other document required by the

immigration laws or regulations prescribed thereunder, or knowingly presents any

such application, affidavit, or other document which contains any such false

statement or which fails to contain any reasonable basis in law or fact.

7.     18 U.S.C. § 1015(a) (False Statements in a Naturalization Proceeding). Whoever

knowingly makes any false statement under oath, in any case, proceeding, or matter

relating to, or under, or by virtue of any law of the United States relating to

naturalization, citizenship, or registry of aliens.

8.    21 U.S.C. § 846 (Conspiracy to Distribute a Controlled Substance). Title 21, United

States Code, Section 841(a)(1) provides that it is unlawful for any person to

knowingly or intentionally manufacture, distribute, or dispense or possess with

intent to manufacture, distribute, or dispense, a controlled substance, and section 846 proscribes conspiracies to commit violations of section 841.

## THE NATURALIZATION PROCESS

9.   Noncitizens seeking to acquire United States citizenship who meet the statutory requirements for naturalization may apply to the Department of Homeland Security, United States Citizenship and Immigration Services (USCIS) for authorization to take the oath of citizenship and thereby become a United States citizen.

10.   In general, among other conditions, the law requires applicants for naturalization to demonstrate an understanding of the English language, including an ability to read, write, and speak simple words and phrases in ordinary usage, as well as a knowledge and understanding of the fundamentals of the history, and of the principles and form of the government, of the United States.  An exception exists for an applicant who is unable to meet these requirements due to a physical or developmental disability, or a mental impairment.

11.   An applicant for naturalization must apply using Form N-400, Application for Naturalization (N-400) and appear for an interview with USCIS. During the interview, the applicant is required to demonstrate an understanding of the English language, through a reasonable test of literacy, as well as knowledge of the fundamentals of the history, and of the principles and form of government, of the United States. However, during the application process, an applicant can submit Form N-648, Medical Certification for Disability Exceptions (N-648).  This form

allows persons with a physical or developmental disability or mental impairment to request the aforementioned exception. The form must be completed by a licensed medical professional who has examined the applicant and has found that the applicant has a physical or developmental disability or mental impairment that's prevents them from being able to meet demonstrate an understanding of the English language or a knowledge and understanding of the fundamentals of the history, and of the principles and form of the government, of the United States, or both.

12. The instructions to the N-648 form state "This form is intended for an applicant who seeks an exception to the English and/or civics requirements due to a physical or developmental disability or mental impairment that has lasted, or is expected to last, 12 months or more." They also state that all parts of the form, except the Interpreter's Certification and the Applicant's Certification, must be certified by a licensed medical professional. Before certifying the N-648 form under the penalty of perjury, the medical professional must conduct an in-person examination of the applicant.

13. If an applicant submits an N-648 form that establishes the applicant's physical or developmental disability, or a mental impairment, the applicant will not be required to demonstrate English proficiency or knowledge and understanding of the fundamentals of the history, and of the principles and form of the government, of the United States, or both, as indicated by the medical professional on the N-648.

14.    In some cases, USCIS will request additional information from the medical professional signing the N-648 before deciding whether to grant a waiver.

## CONTROLLED SUBSTANCE PRESCRIPTIONS

15.    The DEA has determined that certain prescription medications are "controlled" based on their potential for addiction and abuse. The DEA assigns "Schedules" to these prescription medications according to their potential for abuse and addiction, with a controlled substance in Schedule II having the highest potential for addiction and abuse, though some drugs in the other schedules can also be addictive. Prescription drugs which are "controlled" are assigned to Schedule II, III, IV, or V.

16.    Tramadol, commonly known by the brand name Ultram, is a Schedule IV opioid prescription painkiller with addictive properties used for moderate to severe pain relief.

17.    The drug Amitriptyline is used to treat depressive disorders and Cyclobenzaprine is a muscle relaxant used to treat injuries to the muscles.

18.    Title 21 of the United States Code requires that every person who manufactures or distributes a controlled substance be registered with the Drug Enforcement Administration. The registrants' activity with regard to controlled substances is limited to the extent of their registration. Title 21 U.S.C. § 802(21) defines a practitioner as a physician, dentist, veterinarian, scientific investigator, pharmacy, hospital or other person, licensed, registered, or otherwise permitted by the United States or the jurisdiction in which he practices or does research, to distribute,

dispense, conduct research with respect to, administer, or use in teaching or chemical analysis, a controlled substance in the course of professional practice or research.

19.   Title 21 U.S.C. § 822(a)(2) requires that every person who proposes to dispense any controlled substance shall obtain from the Attorney General a registration issued in accordance with the applicable rules and regulations that have been promulgated by the Attorney General.  Title 21 U.S.C. § 802(1) defines the term "dispense" as to deliver a controlled substance to an ultimate user or research subject by, or pursuant to the lawful order of, a practitioner, including the prescribing and administering of a controlled substance and the packaging, labeling, or compounding necessary to prepare the substance for delivery.  Title 21 U.S.C. § 802(27) defines "ultimate user" as a person who has lawfully obtained, and who possesses, a controlled substance for his own use or for the use of a member of his household.

20.   A combination of federal statutes and regulations control the lawful dispensing or distribution of Schedule II through V controlled substances.  It is unlawful for a physician to distribute any Schedule II, III, IV, or V controlled substance if the doctor or pharmacist is "not acting within the usual course of professional practice" in violation of Title 21 USC § 841.

21.   When a doctor prescribes a controlled substance without medical necessity, the doctor is not acting within the usual course of professional practice and distributes the controlled substance unlawfully.

## PSYCHOLOGICAL TESTING

22.     Van Horn routinely documented on her N-648 forms that she performed multiple psychological tests on naturalization applicants.  Some of the tests include the Mini Mental Status Exam (MMSE), The Repeatable Battery for the Assessment of Neuropsychological Status (RBANS), Wide Range Achievement Test-4 (WRAT-4) and the Post Traumatic Diagnostic Scale (PDS).

23.     The MMSE is a set of 30 questions commonly used by doctors and other healthcare professionals to check for cognitive impairment of a patient in the moment. For example, Doctors commonly ask, "Do you know what time it is?", "Do you know where you are?" A doctor might perform the MMSE if there is a reason to suspect a patient may be confused, such as after a head injury or during a sudden episode of illness like an infection. The MMSE is not on its own used to provide a diagnosis. The MMSE is not an I.Q. test or a personality test.

24.     The RBANS is a brief standardized screening tool to measure neuropsychological status in adults aged 20 to 89. This test measures the learning of simple and complex verbal information, basic visuospatial perception, ability to copy a design, auditory registration, visual scanning and processing speed, expressive and receptive language functioning and memory.  This test takes approximately 30 minutes to administer.

25.     The WRAT-4 is an achievement test which measures an individual's ability to read words, comprehend sentences, spell, and compute solutions to math problems. The

WRAT-4 is not an I.Q. test for cognitive ability.   This test is administered in 30 minutes.

26.    The PDS is a scale test used on individuals who identify themselves as victims of a traumatic event. Since the PDS is a self-administered test it requires a reading age of at least 13 years of age. It is a 49-item self-report measure recommended for use in clinical or research setting to measure severity of PTSD symptoms related to a single identified traumatic event. This tool is only a scale test and is not enough to make an affirmative diagnosis.  The PDS test coupled with a multitude of additional tests is needed to make a clinical diagnosis of PTSD.

## THE INVESTIGATION

27.    In 2018, the FBI, initiated its investigation in coordination with USCIS into a conspiracy to defraud the United States of immigration benefits. Based upon information obtained from USCIS and other sources, there is probable cause to believe, and I do believe, that Firoza Van Horn, Muhammad S. Awaisi, and others, are engaged in a conspiracy to defraud the United States of immigration benefits, and, in furtherance of that conspiracy has committed related crimes, as described below.

28.    During this investigation I learned from cooperating government witnesses (CWs), witness interviews, surveillance operations, and confidential human source (CHS) operations that doctors Van Horn and Awaisi falsely diagnosed naturalization applicants with disabilities and other maladies they do not have,

documented tests that were never performed on the applicants, and prescribed medically unnecessary medications all to support false and fraudulent N-648 forms so applicants could bypass the testing requirements to become a U.S. citizen.

### *Immigration Data and Trends*

29.  USCIS researched their databases for the number of N-648 forms filed throughout the United States from April 26, 2016 to September 1, 2020. USCIS found there was a total of 100,983 N-648 filings during this period. Of those, over four thousand were filed in the USCIS Detroit office, 1,249 of which were signed by Van Horn, representing approximately 29% of the total N-648 filings received in the USCIS Detroit office during that timeframe.

30.  USCIS research reveals that Van Horn was the most prolific signer of N-648 forms in the state of Michigan and the second most prolific nationwide during the time period reviewed.

31.  Although the review provided by USCIS only covers the last four years, it is known in the USCIS Detroit office that Van Horn has been signing N-648 forms in support of N-400 applications for approximately the last 10 years.

32.  In addition to the high volume, USCIS adjudicators in Detroit noticed reoccurring problems with the N-648 forms that were signed by Van Horn:

a.  Applicants relying on an N-648 form signed by Van Horn in some cases did not need the benefit of the requested exception, in that they could complete either

the English or the Civics testing despite Van Horn's claims to the contrary in the N-648 form.

b. Facts stated in the N-648 forms would be inconsistent with information provided by the applicant at the interview or present in the applicant's immigration file.

c. Van Horn repeatedly used the same or similar boiler plate language in the N-648 forms she signed.

33. Examples of the diagnoses Van Horn used include "Learning Disorder Not Otherwise Specified". However, upon interviewing the applicants with this diagnosis USCIS discovered that some of them had completed elementary and secondary schooling, and other had professional licenses.

34. Van Horn often documented "Post Traumatic Stress Disorder" supported by a narrative in the N-648 form that explained the etiology of the disorder. In some cases, facts alleged in the narrative were contradicted by the applicant's immigration records or disputed by the applicants. Your affiant's interview of WITNESS-1, described below, is an example of this.

35. When the applicants were interviewed concerning their alleged medical issues, stated by Van Horn in the N-648, they would often claim that they did not have the described medical issues. They often were not under the care of any medical professional and had never been previously diagnosed with the claimed maladies.

36.    In or around November 2019, USCIS conducted a file review of 30 immigration files containing an N-648 form signed by Van Horn. Of the 30 files reviewed, USCIS found fraud or indicators of fraud in 84% (25) of the N-648s.

### General Summary of the Conspiracy

37.    Psychologist Dr. Firoza Van Horn conspires with naturalization applicants, Dr. Muhammad Awaisi, and others to defraud the United States of immigration benefits, specifically naturalization.  Van Horn makes false diagnoses of mental impairments, and Awaisi authors medical reports containing false information and writes medically unnecessary prescriptions to support N-648 forms, including prescriptions for controlled substances.  This is done to allow naturalization applicants to bypass the statutory requirements for attaining United States citizenship.

38.    Van Horn charges $500 for a patient to come to her office and have a sham medical appointment where she asks them questions about their background and medical history.  After the appointment, Van Horn writes false diagnosis and false narratives about her patient's life experiences and health issues on the N-648 form. The applicants are often accompanied to Van Horn by a translator or other community member.

39.    In some cases, Van Horn charges an additional $200 for the services of Awaisi. When she does so, he will also see the applicants on the same day as they see Van Horn.  Awaisi's medical appointment with these patients is also a sham.  The sole purpose for the appointment with Awaisi is for him to medically support Van Horn's

writings in the N-648 by writing his own fraudulent medical report. In those cases, his report is attached to the N-648 form that the applicant receives from Van Horn.

40. Applicants return to Van Horn's office approximately two weeks after their initial appointment to pick up their fraudulent N-648 form.

41. When they pick up the report, Van Horn or another person in the office goes over the N-648 with them and may coach them on what to do and say when they go to USCIS for their immigration interview.

42. The applicant then submits the N-648 form to USCIS, and it becomes part of the applicant's immigration record.

### Subject Background

43. Van Horn is a licensed Psychologist in the state of Michigan assigned license number 6301007985, according to Accurint records.  This license was issued on August 14, 1997 and will expire in 2022.  Van Horn also held licenses as a Certified Social Worker and Social Worker during her career.  State of Michigan Licensing and Regulatory Affairs (LARA) corporate filing records state Van Horn owns her own medical practice called "Michigan Psychological & Consulting Services, P.C." located at 43097 Woodward Avenue, Suite 101, Bloomfield Hills, Michigan, known as SUBJECT PREMISES 2. LARA records show Van Horn incorporated this business on February 9, 2006.  Van Horn is listed as the owner and President of the company.

44.   Van Horn travels to other offices throughout the Detroit Metropolitan area seeing patients and filling out fraudulent N-648 forms.  Such offices include SUBJECT PREMISES 1 located in Dearborn, Michigan at 13350 Michigan Avenue Suite 241, Dearborn, Michigan.

45.   Van Horn resides at xxxx xxxx xxxx Drive, Bloomfield Hills, Michigan, SUBJECT PREMISES 3.

46.   Muhammad Shakeel Awaisi is a medical doctor practicing in the State of Michigan under license number 4301087035, controlled substance license number 5315025499 and DEA registration number BA7649429.  Awaisi has been licensed in the state of Michigan as a Medical Doctor since approximately February 12, 2005.  Awaisi is the owner and registered agent of US Healthcare MI P.C.

### *Interview of Applicant for Naturalization*

47.   Agents interviewed a USCIS applicant ("WITNESS-1"), whom Van Horn provided an N-648 form.

48.   WITNESS-1 was asked what questions Van Horn asked him/her during their appointment and WITNESS-1 stated Van Horn asked how WITNESS-1 was feeling along with other basic questions a doctor typically asks a patient.

49.   WITNESS-1 said he/she took a test wherein he/she was asked to remember some words and another test wherein he/she was asked to draw pictures.

50.   Van Horn's N-648 for WITNESS-1 listed four specific tests that she purportedly performed on WITNESS-1 including the MMSE, the RBANS, the WRAT-4 and the PDS.

51.   WITNESS-1's N-648, written by Van Horn, stated WITNESS-1's principle diagnosis was Cognitive Disorder NOS (not otherwise specified) and WITNESS-1's disability was Chronic Post Traumatic Stress Disorder (PTSD).

52.   Van Horn documented on the N-648 the cause of the Cognitive Disorder NOS came from multiple incidents during WITNESS-1's life including: being held captive by terrorists who hit WITNESS-1 on the head, being assaulted while in Jordan and a car accident in 2013 where Van Horn stated WITNESS-1 lost consciousness causing he/she to have memory loss, poor attention and difficulty multitasking.

53.   Van Horn documented WITNESS-1's disability as PTSD caused by multiple incidents to include being assaulted by Sunni terrorists, being bombed, being jailed for a year by Saddam Hussein, being shot at while at a bus stop with friends and WITNESS-1 being the lone survivor and lastly his/her car accident in 2013.

54.   Agents reviewed the information Van Horn documented on the N-648 with WITNESS-1 and WITNESS-1 stated the information was not true except being in a car accident.

55.   Van Horn stated in the N-648 that WITNESS-1 stopped working because of these medical issues. WITNESS-1 told Agents they owned their own company and were a Regional Director for an Ohio company.

### *Confidential Source Recordings—CHS-1*

<u>June 24, 2020 – Initial meeting with Van Horn and Awaisi</u>

56.  This investigation employed the use of confidential human sources, cooperating witnesses and consensual recordings.

57.  On June 24, 2020, Cooperating Witness-1 (CW-1) and Confidential Human Source-1 (CHS-1) had a scheduled office visit to see Van Horn at SUBJECT PREMISES 1 to conduct a consensually monitored appointment with Van Horn.

58.  During this appointment Van Horn asked why CHS-1 could not take the immigration tests and CHS-1 told Van Horn that they forget sometimes. Van Horn told CHS-1 that everyone tells USCIS they forget things and so USCIS does not believe those applicants anymore and that they would have to figure out some other reason to tell USCIS as to why CHS-1 could not take the tests.

59.  Van Horn told CHS-1 to see her co-worker orthopedic surgeon doctor Muhammad Awaisi who would write a report that would support Van Horn's N-648.

60.  Van Horn told CHS-1 that Awaisi may write CHS-1 a prescription, but CHS-1 didn't have to fill the prescription if CHS-1 didn't want to.  The prescription was just there in case CHS-1 wanted it.

61.  Van Horn suggested CHS-1 tell Awaisi that CHS-1 has headaches, back pain, and is stressed out, can't focus or concentrate, that CHS-1's father died, and that CHS-1 tries to study but can't retain anything.

62.   Van Horn told CW-1 and CHS-1 the total cost was $700 and to pick up the reports two weeks later. Van Horn said she charges $500 for her N-648 forms and Awaisi charges $200 for his medical reports totaling $700.

63.   CHS-1's office visit with Van Horn lasted approximately eighteen minutes.

64.   After the meeting with Van Horn was concluded, CHS-1 met with Awaisi.  Awaisi told CW-1 and CHS-1 that he worked for Van Horn and follows whatever instructions she provides him. Awaisi said he would take care of them and then reviewed CHS-1's medical history, surgical history, family history and employment.

65.   During the exam CHS-1 stated they sometimes had headaches, some shoulder pain and no sleep problems.  CHS-1 never told Awaisi that CHS-1 had knee pain, depression, concentration problems, dizziness or vertigo.

66.   CHS-1's office visit with Awaisi lasted for approximately nine minutes.

<u>July 6, 2020—Retrieval of the N-648</u>

67.   On July 6, 2020, CW-1 and CHS-1 traveled to SUBJECT PREMISES 2 and picked up the completed N-648 form and Awaisi's supporting medical record, which was attached to the N-648. In the N-648, Van Horn diagnosed CHS-1 with "DSM-V: 296.33 Major Depressive Disorder, (Severe)."

68.   Van Horn described CHS-1's Major Depressive Disorder as:

"the person has depressed mood most of the day with constant sense [sic] of hopelessness & despair. It is accompanied by low self-esteem, loss of interest in normally enjoyable activities, low energy, health issues, negatively affects the

Attachments A & B – Page 18

person's personal life, work and education.  There is feeling of guilt and passive or active suicidal thoughts, sleep & appetite disturbance, cognitive functions such as memory, attention and concentration."

69.   Van Horn documented on the N-648 that the reason for CHS-1's diagnosis of Major Depressive Disorder (Severe) was based on CHS-1's stress while living in their home country, having no self-identity, having a difficult time getting out of bed and starting the day, tired all the time and sobbing. Van Horn further stated the depression resulted in recurrent episodes of headaches, dizziness, vertigo, pain all over the body and was exacerbated by the death of CHS-1's father.

70.   The consensually monitored video recording of the June 24, 2020 visit reveals that CHS-1 did not report any of the following to Van Horn which were all documented on CHS-1's N-648: feeling displaced, having "no identity" or having a difficult time getting out of bed, being tired all the time, having recurrent headaches, dizziness and vertigo. Van Horn documented CHS-1 was emotionally upset, depressed, had pain all over their body, sobbed and was difficult to calm down. CHS-1 never presented any of these symptoms to Van Horn.

71.   In addition, Van Horn also stated on the N-648 she performed various psychological tests on CHS-1 that confirm CHS-1's psychiatric illness.  These tests include the Mini Mental Status Examination (MMSE); the General Ability Measure for Adults (GAMA); and the Wide Range Achievement Test (WRAT-4).  However, no tests were performed on CHS-1 at the June 24, 2020 meeting with Van Horn.

72.   Van Horn documented on the N-648 that CHS-1 suffers from cognitive impairment, can't focus, can't pay attention, can't concentrate, can't make appropriate choices, doesn't have good reasoning ability, was in a poor emotional state, has long-standing depression.

73.   Van Horn also reported CHS-1's disability would prevent CHS-1 from demonstrating the ability to read and write English and not able to answer questions regarding United States history and civics, even in a language the applicant understood.

74.   Awaisi documented in his report, attached to the N-648, that CHS-1 complained of knee pain, migraine headaches, depression, sleep problems, concentration problems, dizziness, and vertigo.

75.   The consensually monitored video recording reveals CHS-1 did not present with or discuss knee pain, depression, sleep problems, concentration problems, dizziness, or vertigo.  The video recording reveals that CHS-1 noted pain in one shoulder and sometimes headaches. CHS-1 stated they sometimes had headaches but were not frequent.

76.   Awaisi's report stated that he prescribed CHS-1 a prescription for ULTRAM which is the name brand for the drug Tramadol, an opioid painkiller, and a controlled substance. CHS-1 did not need an opioid painkiller because CHS-1 was not in pain, nor did CHS-1 report to Awaisi that CHS-1 was in pain. This prescription was therefore medically unnecessary.

77.   When CW-1 and CHS-1 traveled to SUBJECT PREMISES 2, on July 6, 2020, to

pick up the N-648 report written by Van Horn, along with the supplemental medical

record from Awaisi, they met with Van Horn, and that meeting was also

consensually recorded.

78.   During this meeting Van Horn "coached" CHS-1 on how to look, what to say and

how to act when CHS-1 went to the USCIS office for CHS-1's interview.

79.   Van Horn told CHS-1 to look plain, not to dress up and be emotional because CHS-

1 is to look, and act depressed to go along with Van Horn's diagnosis on the N-648.

Van Horn showed CHS-1 how to sit in the chair at USCIS so CHS-1 looked

depressed.

80.   Van Horn told CHS-1 to speak some English in the USCIS interview because

USCIS would expect someone who has been the U.S. for a few years to know some

English and if CHS-1 were to claim not to know any English that USCIS would not

believe CHS-1.  Van Horn also said if CHS-1 were to tell USCIS that CHS-1 did not

understand some of what USCIS officials were saying, then it will look like CHS-1

was trying, and USCIS officials will be more likely to believe CHS-1.

81.   Van Horn told CHS-1 that because CHS-1 did not see a lot of trauma like other

people, she [Van Horn] had to say why CHS-1 was so depressed.

82.   Van Horn explained to CHS-1 that Van Horn said CHS-1 worked as a janitor with

CHS-1's sister because with that job CHS-1 would not have to know how to read

and write English to the same extent as CHS-1 would if CHS-1 worked in an office filing paperwork.

83.   This is significant because during CHS-1's first office visit with Van Horn, CHS-1 told Van Horn that CHS-1 worked in an office filing paperwork for a period.

### Confidential Source Recordings—CHS-2

#### July 20, 2020 – Initial meeting with Van Horn and Awaisi

84.   On July 20, 2020, CW-1 and CHS-2 traveled to SUBJECT PREMISES 1 to have a consensually monitored office visit with Van Horn.  During this visit Van Horn asked numerous questions about CHS-2's health, family, background, employment, and why CHS-2 could not take the immigration tests.

85.   During the office visit, Van Horn did not administer any test to CHS-2. Van Horn was paid $500 for her writing the N-648 and $200 for Awaisi writing medical records to support Van Horn's N-648.

86.   CHS-2's office visit with Van Horn lasted approximately seventeen minutes after which, CHS-2 met with Awaisi.

87.   CW-1 said to Awaisi, "We need your help like last time." Awaisi responded, "We'll help you."

88.   Awaisi reviewed CHS-2's medical history, and when finished said, "[CHS-2] doesn't have any major problems. We'll put everything together. We put down like headaches, sleep, memory problem all this. We put it together."

89.   CHS-2's office visit with Awaisi lasted for approximately five minutes.

<u>August 5, 2020—Retrieval of the N-648</u>

90. On August 5, 2020, CW-1 and CHS-2 traveled to SUBJECT PREMISES 1 to pick up the N-648 written by Van Horn and the supporting medical records written by Awaisi.

91. Van Horn documented on the N-648 that she had diagnosed CHS-2 with "DSM-V: 294.10 Neurocognitive Disorder Due to a Traumatic Brain Injury."  Van Horn documented the reason as being from a car accident as a passenger. Van Horn stated that CHS-2 lost consciousness in a car accident, suffered post traumatic amnesia and has since suffered from forgetfulness, irritability and poor concentration.

92. The recording from June 24, 2020, shows that CHS-2 told Van Horn that they were in a car accident as the passenger in someone else's vehicle.  CHS-2 told Van Horn that they never lost consciousness from the accident and does not have a traumatic brain injury.  CHS-2 and CW-1 stated repeatedly during the office visit that CHS-2 was very healthy and nothing was wrong with them.  CHS-2 did not tell Van Horn that CHS-2 suffered from forgetfulness, irritability and poor concentration.

93. Van Horn falsely documented on the N-648 that she performed the following tests on CHS-2: MMSE, WRAT-4 and the RBANS test.

94. The recording from June 24, 2020, reveals that no tests were administered to CHS-2.

95. Awaisi's report was attached to the N-648 and stated CHS-2 came in complaining of lower back pain, shoulder pain, Benign prostatic hyperplasia, headaches, dizziness, concentration and memory problems.

96.   CHS-2 did not present with complaints of lower back pain, shoulder pain, Benign
      prostatic hyperplasia, headaches, dizziness or concentration problems.  CW-1 told
      Awaisi's medical assistant that CHS-2 had trouble with their prostate and had taken
      medication.  CHS-2 specified that CHS-2 was no longer taking medication for the
      prostate.  CHS-2 told Awaisi that CHS-2 sometimes forgets.

97.   Awaisi's report documents that he prescribed four medications to CHS-2:
      Amitriptyline HCl 25mg oral tablet; Cyclobenzaprine HCl 5mg oral tablet;
      Ibuprofen 600mg oral tablet; and Tramadol HCl (Ultram) 50mg oral tablet.
      Tramadol is an opioid painkiller and a controlled substance.

98.   CW-1 asked Awaisi to write a prescription for pain medication for CHS-2. CHS-2
      told Awaisi they were not in any pain, thus did not need any pain medication.
      Awaisi wrote two painkiller prescriptions, one an opioid painkiller and the other was
      prescription strength Ibuprofen.  Because CHS-2 was not in pain the prescriptions
      were therefore medically unnecessary.

99.   Cyclobenzaprine is a muscle relaxing medication.  CHS-2 stated they were healthy
      and had no pain and thus Cyclobenzaprine was therefore medically unnecessary.

100.  Amitriptyline is an antidepressant and nerve pain medication.  CHS-2 did not tell
      Awaisi they were depressed or had any nerve pain therefore this prescription was
      medically unnecessary.

*Affiants Interaction with CHS-1 and CHS-2*

101.   Your Affiant has personally met with CHS-1 and CHS-2 and they both appear physically healthy with no apparent disabilities or mental impairments. CHS-1 can speak English with some assistance and CHS-2 appears fluent in English.

## CONCLUSION

102.   The evidence set forth in this affidavit establishes probable cause that Dr. Firoza Van Horn and Dr. Muhammad S. Awaisi conspired with themselves and others to defraud the United States of immigration benefits all in violation of 18 U.S.C. § 371 (Conspiracy to Defraud the United States), 18 U.S.C § 1546(a) (Fraud and Misuse of Documents); 18 U.S.C. § 1015(a) (False Statements in a Naturalization Proceeding), and 21 U.S.C. § 846 (Conspiracy to Distribute a Controlled Substance).

_____
Bryan Drake, Special Agent
Federal Bureau of Investigation


Sworn to before me and signed in my
Present and/or by reliable electronic means.

_____                    11/17/2020
CURTIS IVY, JR.
UNITED STATES MAGISTRATE JUDGE